COURT OF APPEALS
DECISION
DATED AND FILED

June 11, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP482**

Cir. Ct. No. **2021CV58**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

WENDY TREUTHARDT,

PLAINTIFF-APPELLANT,

V.

CONNEXUS CREDIT UNION,

DEFENDANT-RESPONDENT,

ROSEN NISSAN OF MADISON, LLC,

DEFENDANT.

APPEAL from an order of the circuit court for Green County: MARK A. FRANKEL, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Wendy Treuthardt brought claims under the Wisconsin Consumer Act against Connexus Credit Union related to its attempt to collect on a debt that Treuthardt owes to Connexus under a vehicle loan. Treuthardt alleges that Connexus: failed to provide her with a proper notice of her right to cure her default before it took possession of her vehicle; committed a breach of the peace when it took the vehicle, because at that time she expressed to Connexus's agents what she characterizes as a "verbal objection" to its taking; and in various ways violated debt collection practices prohibited under WIS. STAT. § 427.104(1) (2023-34).[1] On appeal, Treuthardt challenges rulings by the circuit court denying Treuthardt's motion for summary judgment and partially granting summary judgment in favor of Connexus. We reject Treuthardt's arguments regarding each of the court's summary judgment rulings. Accordingly, we affirm.

## BACKGROUND

¶2 Treuthardt purchased a vehicle from Rosen Nissan of Madison ("the dealership") on November 16, 2019. Treuthardt paid for the vehicle using proceeds from a loan financed by Connexus. As part of this transaction, Treuthardt entered into an installment contract with the dealership. A few days after the purchase, Connexus assumed the dealership's position under the contract.[2]

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] For context, we note that an entity named "FILO" approved the credit application for a loan before assigning the loan to Connexus. So far as the parties present the issues on appeal, nothing about the assignment affects our analysis and we do not refer to FILO again.

¶3    In early 2020, Treuthardt fell behind on payments required under the terms of the loan.  In April 2020, Connexus sent Treuthardt a notice of her right to cure this default.  Connexus then agreed to defer two missed payments, but Treuthardt continued to miss subsequent payments.  Connexus eventually directed agents to take possession of the vehicle, which occurred in February 2021.

¶4    Treuthardt commenced this action against the dealership and Connexus in March 2021.

¶5    Regarding the dealership, Treuthardt alleged that it engaged in "fraudulent action[s]" with respect to her vehicle purchase.  Pertinent to this appeal, she alleged that a dealership employee included incorrect information regarding her employment and income on the credit application that the dealership submitted to Connexus on Treuthardt's behalf.  Treuthardt eventually reached a settlement with the dealership regarding her claims against it.

¶6    As for Connexus, Treuthardt claimed that it engaged in "impermissible collection actions" prohibited under various provisions of the Wisconsin Consumer Act.  *See* WIS. STAT. § 421.101.  The operative complaint made the following pertinent allegations in support of her consumer act claims: Connexus failed to provide Treuthardt with a proper notice of her right to cure her default before taking possession of the vehicle; the agents working for Connexus took possession of the vehicle over what Treuthardt characterized as her "verbal objection"; Connexus charged Treuthardt $125 as a purported fee for the cost of taking possession of the vehicle months before Connexus actually had its agents take the vehicle; and Connexus sent Treuthardt information about how to redeem the vehicle to a residential address where she had not lived for approximately 20 years.

¶7      Connexus filed an answer to the operative complaint that included numerous affirmative defenses.   These defenses included the allegation that Treuthardt made "a material false statement" on her credit application by providing an inaccurately high figure for her monthly income.[3]

¶8      Treuthardt and Connexus both brought motions for summary judgment.  Treuthardt specifically sought a ruling that there is no genuine dispute that she proved liability on each of her claims against Connexus under the consumer act.   She also sought a ruling that none of the affirmative defenses asserted by Connexus are viable.   Connexus moved for summary judgment on some of Treuthardt's claims against Connexus.

¶9      The circuit court denied Treuthardt's motion for summary judgment in its entirety.  The court partially granted Connexus's motion and dismissed some of Treuthardt's claims, namely the right-to-cure notice claim and one of her WIS. STAT. § 427.104(1) claims.[4]

¶10      Treuthardt and Connexus later essentially renewed their respective motions for summary judgment on one of Treuthardt's remaining claims, asking the circuit court to make a determination based on undisputed facts.   This was Treuthardt's claim that Connexus's agents breached the peace by taking

---

[3] Connexus also brought counterclaims against Treuthardt that included breach of contract, but nothing about these counterclaims matters for purposes of this appeal except to the extent that the counterclaims involved the same allegation that supported some of Connexus's affirmative defenses, namely, that Treuthardt provided material false information in her credit application to finance the purchase.

[4] The Hon. Thomas Vale decided the parties' summary judgment motions and subsequently denied a motion by Treuthardt for reconsideration of these summary judgment rulings.  All other rulings pertinent to this appeal were made by the Hon. Mark A. Frankel.

possession of the vehicle over her "verbal objection." The court granted summary judgment in favor of Connexus and dismissed the breach of peace claim.

¶11   A jury trial was held on Treuthardt's remaining claims, including that Connexus violated the consumer act by charging her for taking possession of the vehicle before the agents took it. Following the close of Treuthardt's case, the circuit court granted Connexus's motion for a directed verdict dismissing her claim that Connexus improperly charged a fee before it took possession of the vehicle.

¶12   As a result of the circuit court's earlier rulings, only one claim was submitted to the jury.[5] The jury returned a verdict in favor of Connexus on that claim. The circuit court issued a written order dismissing Treuthardt's final claim consistent with the jury verdict.

¶13   Treuthardt appeals this final order, challenging the prior nonfinal circuit court orders dismissing claims before trial.

---

[5] The claim tried to the jury involved Connexus charging Treuthardt for a "force-placed" insurance policy on the vehicle after Connexus took possession of the vehicle. On appeal, Treuthardt does not raise any issue related to this claim, and we address it no further.

**DISCUSSION**

¶14 Although it is at times unclear in Treuthardt's appellate briefing, by the time of her reply brief she clarifies that she exclusively challenges rulings made by the circuit court under summary judgment standards.[6]

¶15 This court reviews an order resolving a motion for summary judgment de novo, applying the same methodology as the circuit court. *Aker v. Good Sportsman Mktg., LLC*, 2026 WI App 3, ¶22, 419 Wis. 2d 460, 31 N.W.3d 1. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting WIS. STAT. § 802.08(2)). "A factual issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶32, 236 Wis. 2d 435, 613 N.W.2d 142.

¶16 "If the moving party has made a prima facie case" in favor of summary judgment, the court examines the summary judgment submissions "to determine whether disputed material facts exist, or whether reasonable conflicting inferences may be drawn from undisputed facts, therefore requiring a trial."

---

[6] The only exception is Treuthardt's challenge to the circuit court's directed verdict that resulted in the dismissal of two of her claims based on the theory that Connexus should not have charged her in advance for taking possession of the vehicle. She challenges this ruling for the first time in her appellate reply brief. We do not consider this argument because Treuthardt raises it too late. *See CreditBox.com, LLC v. Weathers*, 2023 WI App 37, ¶36, 408 Wis. 2d 715, 993 N.W.2d 802 (court of appeals need not address arguments raised for the first time in a reply brief (citing *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998))). Further below, we address Treuthardt's argument that the circuit court should have granted summary judgment in her favor on these claims.

*Brenner v. National Cas. Co.*, 2015 WI App 85, ¶17, 365 Wis. 2d 476, 872 N.W.2d 124. It is not sufficient for a party opposing summary judgment to rest on "'the mere allegations or denials of the pleadings.'" *Racine County v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶30 n.9, 323 Wis. 2d 682, 781 N.W.2d 88 (quoting WIS. STAT. § 802.08(3)). Instead, the party opposing summary judgment, "'by affidavits or as otherwise provided in [§ 802.08], must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting § 802.08(3)).

¶17 The summary judgment materials are viewed in the light most favorable to the nonmoving party. *AccuWeb, Inc. v. Foley & Lardner*, 2008 WI 24, ¶16, 308 Wis. 2d 258, 746 N.W.2d 447.

## I. Right to Cure Notice; Material False Statement

¶18 Treuthardt argues that the circuit court erred by concluding that there is no genuine issue of material fact that Connexus was not subject to the notice requirements of WIS. STAT. § 425.105 before it took possession of the vehicle. Based on our de novo review, we conclude that the court was correct on this point.

¶19 When applicable, WIS. STAT. § 425.105(1) prohibits a merchant from taking possession of collateral from a customer until certain conditions are met.[7] These conditions include that "the merchant believes [that] the customer" is in default. *See* § 425.105(1). Further, "if the customer has the right to cure under" § 425.105, the merchant may take possession of the collateral "only upon the expiration of 15 days after a notice is given" to the customer pursuant to WIS.

---

[7] There is no dispute that at all relevant times Treuthardt qualified as a "customer" and Connexus as a "merchant" for purposes of the Wisconsin Consumer Act. *See* WIS. STAT. § 421.301(17), (25).

STAT. § 425.104(1).  *See* § 425.104(1) ("A merchant who believes that a customer is in default may give the customer written notice of the alleged default and, if applicable, of the customer's right to cure any such default.").

¶20     Pertinent here, WIS. STAT. § 425.105(3m) provides that the customer does not have a right to cure, and therefore the merchant is not required to provide notice of such a right under § 425.105(1), when the customer has defaulted on a collateralized debt in the following way: "making a material false statement in the customer's credit application that precedes [a] consumer credit transaction" to purchase a motor vehicle.  *See* WIS. STAT. § 425.103(2)(bm).

¶21     Here, the circuit court concluded that there is no genuine dispute that Treuthardt made a material, false statement in her credit application.  Accordingly, Connexus was not required to wait until 15 days expired following the giving of a notice of a right to cure before taking possession of the vehicle, because she had no right to receive this notice.  As we explain in the following subsections of this opinion, the summary judgment submissions support dismissal of Treuthardt's right-to-cure notice claim because there is no genuine dispute that Treuthardt made a material, false statement about her income when she signed the credit application.

### A.  Signatures on Credit Application

¶22     Treuthardt concentrates much of her argument regarding the credit application on whether there is a genuine issue as to whether she signed it.  We now provide additional background on this topic.

¶23     Treuthardt gave the following pertinent deposition testimony.  She began leasing the vehicle from the dealership in 2016.  In 2019, she decided to

exercise her right under the lease to purchase it. She planned to finance the purchase through a loan. Treuthardt went to the dealership to purchase the vehicle on November 16, 2019. She recalled going back to an office at the dealership with an employee and that she signed documents that he gave her, but she did not recall which specific documents she signed.

¶24 During her deposition, Treuthardt was presented with exhibits that purport to be the documents that she signed as part of the purchase process. This included a credit application, which was accompanied in the summary judgment materials by a sworn affidavit of a Connexus employee acting as record custodian. The credit application purports to show Treuthardt's signature in two places. The first signature appears in a field part way down the first page, next to which there is text stating, "By signing you certify that the income entered on this credit application is accurate." (Capitalization in original omitted.) Above this signature field is a series of other fields that are filled in. This includes a completed field for monthly salary, reflecting Treuthardt's to be $2,800.00. Treuthardt testified that this first signature on the credit application "could be" hers. She further testified that the only basis she had to doubt that it is her signature was that she could not recall signing that particular document.

¶25 The second signature on the credit application is at the end of the first page, following the statement, "by signing below, you certify that you have read and agree to the terms and disclosures on all pages of this application." (All-caps omitted.) These terms include a section labeled "Agreement," which includes the following:

> You understand and agree that you are applying for credit
> by providing the information to complete and submit this
> credit application…. You certify that the information on

> the application … is true and complete. You understand that false statement may subject you to criminal penalties.

This section of the application defines "you" as the credit applicant and defines "us" as "the dealer, and to the financial institution(s)" that would be "selected to receive" the credit application. As with the first signature, Treuthardt testified that the second "could be" hers. She also testified that she did not "fully" read the documents that she was asked to sign. She testified that this was because she did not have enough time to read them, although she acknowledged that she was not told by the dealership employee that she had a limited amount of time to review any document.

¶26 Given this evidence, the following statutory presumption is triggered here: "when the signing of [any written instrument] is put in issue and instrument purports to have been signed, the instrument itself is proof that it was signed until denied by the oath or affidavit of the person by whom it purports to have been signed." *See* WIS. STAT. § 891.25. Treuthardt testified that she in fact signed documents in the dealership office, and she did not deny that the two signatures on the document could have been hers. Stated in terms of summary judgment procedure, the evidence creates a prima facie case that she signed the credit application in the two places, and Treuthardt offered no evidence to rebut this prima facie case.

¶27 Treuthardt emphasizes that, regarding a different document involved in the vehicle purchase (a "vehicle receipt and odometer disclosure statement"), she affirmatively testified that her initials were forged by someone else. She apparently intends to suggest that her testimony about the initials on a separate purchase document raises a reasonable inference that the signatures on a document used to finance the purchase may have been forged. But it would be mere

10

speculation to draw such an inference. *See North Highland Inc. v. Jefferson Mach. & Tool Inc.*, 2017 WI 75, ¶22, 377 Wis. 2d 496, 898 N.W.2d 741 ("'It is not enough to rely upon unsubstantiated conclusory remarks, speculation, or testimony that is not based upon personal knowledge.'" (quoted source omitted)). Indeed, Treuthardt's forgery allegation about a different document primarily serves to underscore the lack of similar evidence that could undermine the prima facie case that she signed the credit application.

### B. False Income Information

¶28 This brings us to the issue of whether, at the time Treuthardt signed the credit application, the income field was filled in and contained material, false information. The following evidence in the summary judgment submissions is relevant.

¶29 In her deposition, Treuthardt testified that she did not recall what her monthly income would have been at the time of the vehicle purchase, but she was certain that it was lower than the $2,800 shown on the credit application. From context, the only reasonable inference from her testimony was that her actual salary was lower than $2,800 by a meaningful amount. She did not recall what, if anything, she would have told the dealership employee about her monthly income, but she would not have said $2,800, because she had "never made" that much per month. Asked if she thought that the dealership intentionally filled in false income information on her credit application, Treuthardt responded, "I don't know what [the dealership] did."

¶30 James Hutchcroft, a "finance manager" for the dealership, testified to the following in a deposition. He was the employee who asked Treuthardt to sign the documents that had to be completed and executed for the vehicle sale,

including the financing aspect. Hutchcroft testified as follows in his deposition. Hutchcroft described his duties in a sale such as the one here as follows: he would orally "gather information" from the customer necessary to complete the paperwork, "type it in the computer, print [the paperwork] out, have the … customer verify" that the information reflected in the paperwork was accurate, and then ask the customer to sign the paperwork. After the customer reviewed and signed the credit application, Hutchcroft would submit the application to potential lenders, anticipating that a lender would approve a loan to finance the purchase. After submission of the credit application, approval from a lender could come as quickly as a few seconds. After a lender approved a loan, Hutchcroft would prepare additional documents for the customer to review and sign, including a retail installment contract. The process described by Hutchcroft was generally consistent with Treuthardt's deposition testimony to the extent that she testified that she was able to secure financing and finalize her vehicle purchase over the course of about two hours, during a single visit to the dealership.

¶31    A Connexus employee, Lamont Bonham, gave deposition testimony and averments by affidavit to the following. Connexus relied on the information included in the credit application provided by the dealership in determining whether to approve the loan, which occurred on the same day that the application was submitted. Primary considerations for a credit union, such as Connexus, in deciding whether to approve a loan are the applicant's income, the amount of money loaned to the applicant, and the applicant's credit score.

¶32    This evidence raises a prima facie case that, when Treuthardt signed the credit application, certifying that it accurately reflected her monthly income, it reflected what she admits was an income figure that was meaningfully above her actual income. A key point from Hutchcroft's testimony is that, for a transaction

involving a financed vehicle, he would generally complete the information shown in a credit application *before* handing it to the customer for review and signature. This is not inconsistent with any of Treuthardt's testimony about what happened at the dealership, including that she would not have reported income as high as $2,800 per month. Assuming that this is true, it remains that there is no evidence showing or raising a reasonable inference that false information of any kind was added into the credit application *after* Hutchcroft presented it to Treuthardt for her review and signature. As a result, the only reasonable inference from the relevant evidence pertinent to this issue is that Treuthardt signed a credit application to certify the accuracy of its contents at a time when the application contained material, false income information.

¶33    On appeal, Treuthardt argues that there is a credibility issue regarding Hutchcroft's testimony that renders summary judgment inappropriate because Hutchcroft "completely changed" his testimony from one portion of the deposition to another. Specifically, she emphasizes the following. Relatively early in the deposition, when asked about "everything" that he said to Treuthardt during the transaction, Hutchcroft recalled only a few details, none of which related to the completion and signing of the credit application. Later in the deposition, Hutchcroft gave the testimony noted above about the general process that he used in preparing credit applications. He also testified to details about "going through the credit application with" Treuthardt. Based on this, Treuthardt argues that at trial she could have challenged Hutchcroft's credibility based on what she argues are "conflicting versions" of his pertinent testimony.

¶34    We question whether Treuthardt has identified an inconsistency that could represent impeachment of any significance. Beyond that, even if a finder of fact completely disregarded Hutchcroft's testimony regarding particular details

specific to Treuthardt's transaction, Treuthardt does not identify evidence rebutting the prima facie case described above. In particular, she fails to identify any aspect of Hutchcroft's testimony that was inconsistent or illogical in describing how credit applications were generally prepared for review by the customer before the prompt submission of each application to potential lenders.

¶35 Treuthardt argues that there is a genuine issue of fact regarding whether the dealership, and not Treuthardt, was responsible for the false information regarding her income appearing on the credit application. Because of this, she asserts that summary judgment dismissing her right-to-cure notice claim was inappropriate, even if there is no genuine issue of fact that she signed the credit application containing false information. However, Treuthardt does not explain why her certification of false information, assuming that the false information was initially supplied by the dealership, would prevent the occurrence of a default under WIS. STAT. § 425.103(2)(bm). In that scenario, the income information on the credit application would still have been false, and Treuthardt still signed the application certifying that it is was complete and true.

¶36 Treuthardt frames her argument regarding the dealership's alleged inclusion of false information in terms of case law discussing fraudulent misrepresentation. She notes the following propositions from case law: "the recipient of a fraudulent misrepresentation is justified in relying on it, unless the falsity is actually known or is obvious to ordinary observation," and "whether falsity is obvious is usually a question of fact." *Hennig v. Ahearn*, 230 Wis. 2d 149, 170, 601 N.W.2d 14 (Ct. App. 1999) (citations omitted). She further observes that, as a matter of law, claiming fraudulent inducement to enter a contract is not barred merely because the fraudulently induced party failed to read the contract. *Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 733, 456 N.W.2d

14

585 (1990). Although her argument is difficult to track, we understand her to rely on these legal standards to argue that it is reasonably inferable that the dealership supplied false income information by typing it into the credit application, and then Treuthardt reasonably relied on the dealership to supply correct information when she signed the credit application without reading it.

¶37 But these inferences are beside the point. The point is that Treuthardt provided Connexus with false information in a manner that triggers WIS. STAT. § 425.103(2)(bm). As discussed above, applying summary judgment standards to pertinent parts of the record here, Connexus can rely on unrebutted evidence that she did this. Whatever other potential remedies against the dealership Treuthardt might theoretically have, she does not explain why the scope of Connexus's statutorily defined duty to provide notice of a right to cure would be altered if the dealership supplied the false income information and Treuthardt reasonably relied on this information as correct in signing.

¶38 Beyond this, Treuthardt's arguments about the dealership's allegedly fraudulent conduct lacks support in the summary judgment materials. Treuthardt could hardly allege that the dealership falsely represented to her what her own monthly income was. She testified that she did not recall any discussion of the income information, and she did not testify that she was asked *not* to review the information that had been filled in on the credit application. To repeat, this leaves nothing to refute Hutchcroft's testimony that, in such transactions, he gathered information and then prompted the customer to review and consider signing an application after the information, such as income, had been filled in. In other words, Treuthardt does not identify evidence in the record raising a reasonable inference that she was not asked about her income before Hutchcroft filled in the credit application with $2,800, that she gave him a lower, accurate figure that he

disregarded, or that he incorrectly typed the figure that she gave him into the application form, all before she signed. Further, to the extent that the dealership presented her with false information about her own income, that would not present the "usual[]" case in which the reasonableness of relying on that information presented a disputed factual issue for a jury. *See **Hennig***, 230 Wis. 2d at 170. Again, Treuthardt testified that she would not have told the dealership that her income was $2,800 a month, because she knew that she did not make this much. *See **Tietsworth v. Harley-Davidson, Inc.***, 2004 WI 32, ¶13, 270 Wis. 2d 146, 677 N.W.2d 233 (claim of misrepresentation requires, among other elements, that induced party "*believed* and relied on the misrepresentation" (emphasis added)).[8]

## II. Breach of Peace

¶39    Treuthardt argues that the circuit court erred in denying her summary judgment on her claim that Connexus, through its agents, committed a "breach of the peace" in taking possession of the vehicle. We conclude that the circuit court properly denied her motion and appropriately dismissed Treuthardt's breach-of-peace claim.

¶40    Before discussing our conclusion further, we explain that we make the following two assumptions. First, as noted above, we assume without deciding that our review of this issue calls exclusively for the application of summary judgment standards, contrary to Connexus's argument that the circuit court here made findings of fact to which we should defer.

---

[8] Because we conclude that Connexus was not required to provide a notice of a right to cure prior to taking possession of the vehicle, we need not address the parties' arguments about whether the notice that Connexus did send to Treuthardt, before it agreed to defer two missed payments, met pertinent statutory requirements.

¶41 The second assumption involves a video recorded by an agent of Connexus during the taking of the vehicle. This video was presented to the circuit court by the parties in connection with this issue. The video is not included in the record on appeal. Instead, Treuthardt relies exclusively on a transcript of the video. We assume that the contents of the video supports the circuit court's summary judgment decision in favor of Connexus. *See State v. McAttee*, 2001 WI App 262, ¶5 n.1, 248 Wis. 2d 865, 637 N.W.2d 774 ("It is the appellant's responsibility to ensure completion of the appellate record and 'when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the [circuit] court's ruling.'" (quoted source omitted)). More specifically, we assume that there is nothing in the video, which is not evident in the transcript, that would allow this court to conclude that there is a genuine issue of material fact on the breach-of-peace issue that would favor Treuthardt.

### A. Legal Standards

¶42 Under the terms of Connexus's loan to Treuthardt, the vehicle was collateral that secured the debt. Pursuant to WIS. STAT. § 425.206 ("Nonjudicial enforcement limited"), Connexus had only a limited right to take possession of the vehicle following Treuthardt's default. Pertinent here, § 425.206 prohibited Connexus, "[i]n taking possession of [the] collateral," from "[c]omit[ting] a breach of the peace." *See* § 425.206(2)(intro.) and (a).

¶43 This court explained what constitutes a breach of the peace in this context in *Hollibush v. Ford Motor Credit Co.*, 179 Wis. 2d 799, 804-12, 508 N.W.2d 449 (Ct. App. 1993) (applying identical language in then-existing version of § 425.206(2) and (2)(a)). This court noted that the Wisconsin Consumer Act

17

does not define "breach of the peace." *Id.* at 804. Accordingly, we turned to persuasive authority discussing the concept as it is addressed in the Uniform Commercial Code. *Id.* at 804-12. We noted that courts from other jurisdictions and secondary authorities had explained that "a self-help repossession [of collateral] in the face of a debtor's contemporaneous objection constitutes a breach of the peace." *Id.* at 811 (citing ***First and Farmers Bank of Somerset v. Henderson***, 763 S.W.2d 137, 140 (Ky. Ct. App. 1988)).[9] "The underlying theory of [this approach] is that a verbal objection to a repossession is the precursor to violence, and that it should not be necessary for a debtor to resort to violence to provide the breach of the peace necessary to defeat a self-help repossession." *See id.* Based on this reasoning, we concluded in ***Hollibush*** that there was a breach of the peace when the debtor or the debtor's fiancé told the creditor's agent "that he was not to repossess the vehicle," but the agent "nonetheless did so." *Id.* at 803-04, 812.

¶44 The court in ***Hollibush*** favorably quoted persuasive authority for the proposition that the debtor must raise an "unequivocal oral protest." *Id.* at 810 ("'When a creditor repossesses in disregard of the debtor's unequivocal oral protest, the repossession may be found to be in breach of the peace.'" (quoting ***Dixon v. Ford Motor Credit Co.***, 391 N.E.2d 493, 497 (Ill. App. 1979) (in turn citing a treatise on the Uniform Commercial Code))). While ***Hollibush*** quoted

---

[9] We note that in ***Hollibush***, and in parts of the record in this case, "repossession" is used interchangeably with what we generally refer to as "taking possession of collateral," which is the phrase used in pertinent consumer act statutes. *See Hollibush v. Ford Motor Credit Co.*, 179 Wis. 2d 799, 804-12, 508 N.W.2d 449 (Ct. App. 1993); WIS. STAT. §§ 425.105(1), 425.206(2). Accordingly, we sometimes quote and ourselves employ variations on the term "repossess," even though Connexus, as the lender in the vehicle purchase, had not previously possessed the vehicle before its agents took it during the disputed incident in this case.

other formulations of the standard that did not include the specific term "unequivocal," we agree with Connexus that *Hollibush* establishes a rule that a debtor's verbal objection must be "unequivocal" in the sense that the debtor must convey an unambiguous request or demand that a creditor's agent not take or stop taking the collateral. As we explain below, Treuthardt's arguments to the contrary are not consistent with *Hollibush*.

### B. Application

¶45 Treuthardt relies on three statements that she made to Connexus's agents during their encounter after they arrived on the scene, before they took the vehicle. These three statements are reflected in the transcript referred to above. The following are the statements that she contends each constitutes the required "contemporaneous objection" referred to in *Hollibush*.

- After one agent asked Treuthardt if she "[w]ould … like to get [her] stuff out" of the vehicle before the agents towed it away, Treuthardt responded, "Well yeah. I don't even want you taking my car."

- After one agent told Treuthardt that the agent would provide her with contact information for her lienholder, Treuthardt said, "Well, I don't agree with this at all."

- After an agent asked Treuthardt if there was anything else the agent could help her with before the agents left with the vehicle, she responded, "Not without taking my car."

Treuthardt does not direct us to evidence in the record tending to show what tone or volume was used in delivering these statements. Nor does she identify evidence, in addition to making these statements, that she took other, nonverbal actions—for example, gestures or the use of written material—that could have led to a breach of the peace.

19

¶46 To be sure, each statement reflected Treuthardt's disappointment that the agents planned to take the vehicle away and her preference that they not do that. That is, she unmistakably indicated that she did not affirmatively consent to the taking away of the vehicle, although some of her statements appeared to signal her resignation to the fact that the agents were going to take it. *See Hollibush*, 179 Wis. 2d at 806 ("consent of the debtor is not necessary for a peaceful self-help repossession"). For example, the last statement appears to have meant, "There is nothing you could do to help me except not take my car." But none of her statements amounts to an unambiguous request or demand that the agents not take or stop taking the vehicle, which was necessary to implicate the reasoning in *Hollibush*. *See id.* at 808-09 (discussing a debtor's "unsuccessful[] demands that a repossessing creditor desist" or a debtor's "'disregarded … request to desist … efforts at repossession'" (quoted source omitted)). Stated in terms of the reasoning in *Hollibush*, she did not make a statement that could reasonably be seen as a potential "precursor" to acts of "violence," either by Treuthardt or the agents. *See id.* at 808.

¶47 Treuthardt points out that the provisions of the Wisconsin Consumer Act are to be "liberally construed and applied to promote [the Act's] underlying purposes." *See* WIS. STAT. § 421.102(1). One weakness in this argument is that Treuthardt does not specify which purpose of the Act that she claims is implicated here. In any case, emphasizing the liberal construction rule here could not help Treuthardt, because we must apply *Hollibush* as binding precedent that provides the applicable construction of "breach of the peace" in WIS. STAT. § 425.206(2)(a).

¶48 Treuthardt argues that it is not reasonable to use a "one size fits all standard" for determining when a debtor has made a sufficient objection or protest

under *Hollibush*, and instead "[c]ustomers must be allowed to use their own personalities to convey a verbal protest." The concept appears to be that the breach-of-peace standard can be triggered even if a debtor uses relatively softer tones or relatively politer language to convey an unambiguous request or demand. This is a fair point as far as it goes: we see no reason that a debtor's statement to a repossession agent, "You may not take my vehicle," counts not only when conveyed in a loud, aggressive tone but also when conveyed in a quiet, respectful tone. *See Hollibush*, 179 Wis. 2d at 812 (analyzing statement of debtor or debtor's fiancé without reference to evidence about how the statement might have been delivered). But this point does not help Treuthardt here. We do not rest our conclusion on the fact that there is no evidence in the appellate record that Treuthardt's volume or tone in speaking, or any of her nonverbal conduct, created or contributed to a triable issue of material fact beyond what we read in the transcript. We consider the content of her statements as shown in the transcript under the breach of the peace logic as characterized in *Hollibush*. For the reasons we have explained, this language, however it was delivered, did not constitute an unambiguous request or demand that the agents not take the vehicle or stop taking it. One can easily imagine a long list of statements that debtors could make that would qualify as unambiguous requests or demands that the agents not take or stop taking the vehicle, but Treuthardt did not make any such a statement here.

## III. Prohibited Debt Collection Practices

¶49 Treuthardt argues that the circuit court erred by concluding that Connexus did not violate WIS. STAT. § 427.104(1) through multiple forms of conduct that creditors are prohibited from engaging in when attempting to collect on alleged debts arising from certain categories of transactions. She specifically alleges that Connexus violated: § 427.104(1)(h), which as pertinent here prohibits

21

"[e]ngag[ing] in … conduct which can reasonably be expected to threaten or harass the customer"; and § 427.104(1)(j) which in pertinent part prohibits "[c]laim[ing] … a right with knowledge or reason to know that the right does not exist." She contends that the following alleged conduct by Connexus violated one or both of these prohibitions: charging Treuthardt $125 for taking possession of the collateral several months before the vehicle was taken, and sending a notice regarding Treuthardt's right to redeem the vehicle to an incorrect address.[10]

¶50 The circuit court denied summary judgment in Treuthardt's favor regarding each of her WIS. STAT. § 427.104(1) claims. The court granted summary judgment in favor of Connexus, dismissing the § 427.104(1) claims based on the right to redeem being sent to an incorrect address. The court dismissed the § 427.104(1) claims based on the $125 charge through a directed verdict that it granted after the close of the plaintiff's case. *See supra* note 6.

**A. Charge for Taking Possession of the Collateral**

¶51 Treuthardt's argument regarding the $125 charge is based on the following undisputed evidence from the summary judgment materials. Connexus provided Treuthardt with a quarterly account statement that contained an entry for $125 as a charge, dated December 2019, related to the taking possession of her vehicle. This meant that the charge was included on Treuthardt's account

---

[10] Treuthardt also contends that it was a violation of WIS. STAT. § 427.104(1)(h) and (j) for Connexus to take possession of the vehicle over her verbal objection. But so far as Treuthardt argues the point, Connexus took possession of the vehicle in violation of § 427.104(1) only to the extent that this constituted a "breach of the peace." For example, she does not argue that the taking of the vehicle here could be reasonably expected to harass her, even if it does not fit the breach-peace-standards outline in *Hollibush*. Accordingly, we need not address the breach-of-peace topic again, given our conclusion that Connexus did not breach the peace.

statement several months before Connexus took possession of the vehicle in February 2020. Based on this evidence, Treuthardt argues that there is no genuine or material dispute of fact that the decision by Connexus to include the charge on Treuthardt's account statement when it did violated WIS. STAT. § 427.104(1)(h), because it could be reasonably expected to harass her. She also contends that, by including this charge when it did, Connexus claimed a right that it knew or had reason to know did not exist, in violation of § 427.104(1)(j). We address these arguments in turn, resolving both against Treuthardt based on the correct standards of review. This is based in significant part on undisputed evidence that Connexus had a statutory and contractual right to impose the charge when it did because it was incurred by Connexus in searching for the vehicle as part of the attempt to take it, and because Connexus had the right to apply payments under the contract toward the charge even before redemption of the vehicle.

*Whether the Charge for Taking Possession of the Vehicle was Reasonably Expected to Harass Treuthardt*

¶52    Neither party identifies any standards of review that are specific to determining what "can reasonably be expected to … harass the customer" under WIS. STAT. § 427.104(1)(h). In our own limited research, we have not been able to identify precedent addressing what constitutes "can reasonably be expected to … harass the customer" under § 427.104(1)(h). But this court has addressed the phrase "can reasonably be expected to … harass the customer" in the context of a substantially similar provision, § 427.104(1)(g). *See **Associates Fin. Servs. Co. of Wisconsin v. Hornik***, 114 Wis. 2d 163, 166-70, 336 N.W.2d 395 (Ct. App. 1983). Subpart (1)(g) addresses what can be reasonably expected to harass by "communicat[ing]" with customers or their relatives, while subpart (1)(h) addresses what can be reasonably expected to harass through "other conduct"

23

besides communication. Although neither party cites to *Associates* as a guide to apply § 427.104(1)(h), for reasons we now explain we conclude that the reasoning regarding the standard of review in *Associates* applies with equal force to the latter provision.

¶53 In *Associates*, we explained that a customer claim under WIS. STAT. § 427.104 (and the surrounding provisions of WIS. STAT. ch. 427) "is in [the] nature [of] a tort action." *Associates*, 114 Wis. 2d at 167. The duty of care element for this type of tort is established in § 427.104. *See Associates*, 114 Wis. 2d at 167. Applying the logic of *Associates* here, "[t]he focus" of subpart (1)(h) is "whether the collector's [conduct] can reasonably be expected to threaten or harass." *See id.* at 168. This constitutes an objective element. *See id.* However, this "standard's objective character does not create a question of law," because "[t]he application of a duty of care to a given set of facts will generally remain within the province of the trier of fact." *See id.* Thus, in *Associates*, we upheld the circuit court's findings that the creditor conduct in that case (involving repeated collection phone calls) was not reasonably expected to harass because the court's findings to that effect were "not clearly erroneous." *See id.* at 169-70.

¶54 Given these standards, Treuthardt fails to persuade us that she is entitled to judgment on this issue as a matter of law. *See* WIS. STAT. § 802.08(2). She rests her argument on the premise that, under her installment contract with Connexus and pertinent provisions of the consumer act, Connexus had no basis to charge Treuthardt for anything related to taking possession of her vehicle before Connexus in fact took the vehicle. Even if we accept this premise, in light of the discussion in *Associates*, it would remain the province of the jury to decide if this conduct was reasonably expected to harass. Further, as we explain in addressing Treuthardt's WIS. STAT. § 427.104(1)(j) claim based on the repossession charge,

we disagree that Connexus had no basis to make the charge under the installment contract and pertinent statutes.

*Whether the Charge for Taking Possession of the Vehicle Claimed a Right that Did Not Exist*

¶55    We turn to Treuthardt's argument that Connexus claimed a right to bill her for the repossession charge at a time when it knew or had reason to know that it did not yet have that right.  As we explain below, setting aside the timing of when Connexus included the $125 charge in Treuthardt's account statement, it did have a right as a matter of contract, consistent with pertinent statutes, to charge Treuthardt for that amount.  Then, when we take into account the timing of billing, we conclude that there is a genuine issue of fact regarding whether this was a premature claim of a right in violation of WIS. STAT. § 427.104(1)(j).

¶56    Under WIS. STAT. § 422.413(2g), "In any consumer credit transaction in which the collateral is a motor vehicle[,] … a writing evidencing the transaction may provide for the creditor's recovery of" the "[e]xpenses of taking and holding the collateral if paid to persons not related to the creditor."  *See* § 422.413(2g)(intro.) and (a).

¶57    The installment contract here states in part that one of Connexus's "remedies upon default" is that Connexus "may take (repossess) the vehicle from you after we give you any notice the law requires."  The installment contract further adds:

> **e. How you can get the vehicle back if we take it.**  If we repossess the vehicle, you may pay to get it back (redeem).  We will tell you how much to pay to redeem.  You may have to pay expenses we pay as a direct result of taking and holding the vehicle as the law permits.  Your right to redeem ends when we sell the vehicle.

**f. We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle. We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are travel and transportation expenses of the creditor in taking the vehicle and expenses paid to persons not related to the creditor as a direct result of taking, holding, cleaning, restoring, and repairing the vehicle, as the law permits.

The contract also gives Connexus the right to "apply" required payments by Treuthardt to any "amount [that Treuthardt] owe[s] under [the] contract in any order [Connexus] choose[s]," including the principal, interest, and "other" amounts that she would owe under the contract. That is, under this provision, had Treuthardt paid an amount toward the balance shown on her account statement from December 2019 that was less than the total owed, Connexus could count that as a payment to reduce specific parts of the total—including principal, interest, or contractually authorized charges—in whatever order Connexus chose.

¶58 With this as background regarding Connexus's statutory and contractual authority to collect expenses for taking possession of the vehicle, we turn to the evidence regarding the $125 charge at issue. Connexus employee Bonham testified to the following in a deposition. This charge was included in the account history for Treuthardt's loan to reflect that the agent that Connexus used to find and take collateral from its debtors charged Connexus a fee in connection with the potential repossession of Treuthardt's vehicle following her default. This was based on Connexus's decision to switch from one method of finding and taking collateral to a second, more expensive method. Specifically, Connexus directed its agent in Treuthardt's case to switch from a "general" or "regular" process to a "direct skip" process. Bonham explained that if the agents were not able to find the collateral that Connexus was trying to take possession of within approximately 30 to 90 days, Connexus would advise the agents to move to "direct

26

skip," which involves more thorough investigative techniques to try to locate the collateral.

¶59 Reasonably inferable from Bonham's deposition testimony was that the agent Connexus used here had attempted to take possession of Treuthardt's vehicle, but was unable to locate it using the more "general" process, and that Connexus decided to pay the agent to switch to the "direct skip" process to find the vehicle in order to eventually take it. If credited, this testimony shows that Connexus incurred the $125 charge as a direct result of the search for the vehicle well in advance of taking it.

¶60 Treuthardt does not contest that the $125 was incurred by Connexus as payment for the search for and then taking possession of the vehicle. Instead, she contends that Connexus exceeded its rights under the contract based on the timing of when it added the charge as a bill to her. That is, Treuthardt asserts that Connexus had no contractual authority to add the charge to her account before the vehicle was sold. This argument fails because it relies on the paragraph of the contract addressing the sale of the vehicle after a debtor fails to redeem, without taking into account other provisions of the contract. As shown above, the contract provision addressing Treuthardt's right of redemption clearly contemplates that Connexus could require her to pay expenses directly resulting from the taking of the vehicle as part of the redemption, before the sale of the vehicle. The contract also gives Connexus the right to apply payments by Treuthardt to any amount owed under the contract. Treuthardt does not explain why the $125 charge to cover the higher search cost would not qualify as such an amount owed merely because the taking possession of the vehicle was not yet completed. At a minimum, she fails to show that there is no genuine issue of material fact that

Connexus's inclusion of $125 charge constituted a claim of a right that it knew or had reason to know it did not have.

**B. Redemption Notice Mailed to Incorrect Address**

¶61    There is no dispute that Connexus tried to send Treuthardt a notice regarding her right to redeem the vehicle after Connexus took possession of the vehicle, but there is also no dispute that it sent this notice to an incorrect address. Specifically, the notice was sent to an address that was Treuthardt's residence only during the period 2000 to 2002. In doing so, Treuthardt argues, Connexus failed to comply with what she contends was its contractual duty to inform her of her right to redeem. As noted above, the installment contract states in part that Connexus, after taking possession of the vehicle, "will tell you how much to pay to redeem." She further argues that this contractual failing violates WIS. STAT. § 427.104(1)(h), because failing to send the notice to the proper address could reasonably be expected to harass Treuthardt. For these reasons, Treuthardt contends, the circuit court erred by failing to grant summary judgment in her favor on this claim and instead granting summary judgment in Connexus's favor and dismissing the claim.

¶62    We reject Treuthardt's argument on this issue for at least the reason that she does not explain how, under any reasonable inferences that can be drawn in her favor from the summary judgment materials, Connexus's failure to deliver the right to redeem notice to a proper address could have been reasonably expected to harass her. Among the notable omissions from her argument is the lack of identification of any evidence that could establish that someone in Treuthardt's position would become aware of Connexus's failure to send the notice to a correct address, as well as the lack of evidence that, even if she did

28

become aware, this was a deliberate effort to improperly influence her in connection with debt collection.

## IV. Summary Judgment Regarding Affirmative Defenses

¶63    Treuthardt asserts that the circuit court erred by failing to "dismiss" Connexus's affirmative defenses on her motion for summary judgment. We question whether Treuthardt identifies a form of relief that the circuit court had authority to grant, because she does not support the proposition that an affirmative defense is a standalone pleading that may be "granted" or "dismissed" on summary judgment. *See* WIS. STAT. § 802.08(1) ("A party may … move for summary judgment on any *claim, counterclaim, cross claim, or 3rd-party claim* which is asserted by or against the party." (emphasis added)). Further, she does not make clear how she could benefit from a favorable ruling on this issue, given our conclusions regarding the circuit court's dismissal of her claims on summary judgment.

¶64    But even setting to the side these substantial problems, we reject her argument because it is unsupported. Treuthardt apparently means to argue that the circuit court was required to grant her motion to "dismiss" the affirmative defenses because, she asserts, Connexus did not develop an argument in the circuit court specifically opposing that motion. This argument fails for at least the reason that Treuthardt does not direct us to legal authority that could support an argument that it was reversible error for the circuit court to make its summary judgment rulings even if Connexus failed to specifically oppose Treuthardt's motion to dismiss the affirmative defenses. She relies entirely on *Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979), but the pertinent proposition in that case is that, *on appeal*, this court may take as

conceded the failure of a respondent to attempt to refute an argument made in an appellant's brief-in-chief. Treuthardt does not attempt to show, using the appropriate methodology, that she is entitled to any particular summary judgment ruling regarding Connexus's affirmative defenses.

## CONCLUSION

¶65 For all of these reasons, we affirm the order of the circuit court.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.